**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATHANAEL KLINGBERG, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>     v.<br><br>MGT CAPITAL INVESTMENTS, INC., ROBERT B. LADD, JOHN MCAFEE, ROBERT S. LOWREY, BARRY C. HONIG, JOHN STETSON, MICHAEL BRAUSER, JOHN O'ROURKE III, and MARK GROUSSMAN,<br><br>     Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nathanael Klingberg ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through

1

Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MGT Capital Investments, Inc. ("MGT Capital" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded securities of MGT Capital from October 9, 2015 through September 7, 2018, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 9(a) and (f), 10(b), 20(a), and 20(b) of the Exchange Act (15 U.S.C. §§ 78i(a), 78i(f), 78j(b), 78t(a), 78t(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place within this District.

5.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying PSLRA Certification, acquired MGT Capital securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.    From 2013 until April 2016, Defendant MGT Capital described itself primarily as "engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry." In May 2016, MGT Capital announced it was transforming itself into a cybersecurity company. MGT Capital currently engages in bitcoin mining, with operations in the State of Washington and Sweden. The Company is incorporated in Delaware and headquartered in Durham, North Carolina. MGT Capital securities trade over-the-counter ("OTC") under the symbol "MGTI." MGT Capital previously traded on the New York Stock Exchange ("NYSE") under the ticker symbol "MGT."

8.      Defendant Robert B. Ladd ("Ladd") was the Company's Chief Executive Officer ("CEO") from January 2012 until November 18, 2016, and reappointed CEO on August 16, 2017 until his leave of absence on September 10, 2018. Defendant Ladd was appointed interim Treasurer and interim Chief Financial Officer ("CFO") on December 8, 2015. Defendant Ladd is also a director.

9.      Defendant John McAfee ("McAfee") was appointed as the Company's Executive Chairman on September 9, 2016, and CEO on November 18, 2016, holding those positions until his resignation on August 15, 2017.

10.     Defendant Robert S. Lowrey ("Lowrey") has been the Company's CFO since his appointment on March 8, 2018.

11.     Defendant Barry C. Honig ("Honig") was a shareholder of MGT Capital and participated in a scheme to artificially inflate the price of MGT Capital securities.

12.     Defendant John Stetson ("Stetson") was a shareholder of MGT Capital and participated in a scheme to artificially inflate the price of MGT Capital securities.

13.     Defendant Michael Brauser ("Brauser") was a shareholder of MGT Capital and participated in a scheme to artificially inflate the price of MGT Capital securities.

14.     Defendant John O'Rourke III ("O'Rourke") was a shareholder of MGT Capital and participated in a scheme to artificially inflate the price of MGT Capital securities.

15.     Defendant Mark Groussman ("Groussman") was a shareholder of MGT Capital and participated in a scheme to artificially inflate the price of MGT Capital securities.

16.     Defendants Ladd, McAfee, and Lowrey are herein referred to as the "Officer Defendants."

17.     Defendants Ladd, Honig, Stetson, Brauser, O'Rourke, and Groussman are herein referred to as the "Scheme Defendants."

18.     Defendants Ladd, McAfee, Lowrey, Honig, Stetson, Brauser, O'Rourke, and Groussman are collectively herein referred to as the "Individual Defendants."

19.     Collectively, Defendant MGT Capital and the Individual Defendants are herein referred to as "Defendants."

20.     Each of the Officer Defendants:

    a.     directly participated in the management of the Company;

    b.     was directly involved in the day-to-day operations of the Company at the highest levels;

5

c.    was privy to confidential proprietary information concerning the Company and its business and operations;

d.    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.    approved or ratified these statements in violation of the federal securities laws.

21.    MGT Capital is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MGT Capital under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS[1]

### Honig, Stetson, Groussman, Brauser, and O'Rourke Secretly Obtain MGT Capital Shares

23.     On September 26, 2015, the Scheme Defendants initiated a pump-and-dump scheme in MGT Capital. Honig informed Stetson to "put together a term sheet for [MGT Capital]" and outline the proposed terms of the arrangement. Honig directed Stetson to send the proposal to Ladd, MGT Capital's CEO at the time.

24.     The deal contemplated the issuance of 2.8 million MGT Capital shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker. This structure allowed investors to repeatedly convert and sell shares while appearing individually to stay below the 5% threshold at which Section 13(d) of the Exchange Act required public disclosure of holdings. This ostensibly enabled Honig and his associates to conceal their participation in their illicit pump-and-dump scheme.

25.     Ladd knew of Honig and his associates' interest in, and control over, MGT Capital. On October 1, 2015, Ladd emailed Honig that "NYSE MKT wants to know the buyers. $175,000 x 4 investors will be each at 4.9%. . . ." Honig replied, copying Brauser and Stetson, that he would get back to him shortly with names but for now, to use "Barry Honig Mike Brauser OBAN [an LLC created by Stetson]."

---

[1] The following allegations are taken from a complaint captioned *SEC v. Honig, et al.*, No. 18-cv-08175 (Sept. 7, 2018 S.D.N.Y.)

26.    On October 5, 2015, Stetson provided MGT Capital with names of investors who would participate in the financing, including entities held by Honig, Stetson, Groussman, Brauser, and O'Rourke. The Honig-led financing ultimately provided $700,000 to MGT Capital.

27.    On October 9, 2015, MGT filed a Form 8-K with the SEC disclosing that the prior day, it had "entered into separate subscription agreements . . . with accredited investors. . . relating to the issuance and sale of $700,000 of units[.] . . ."

28.    MGT Capital failed to disclose the names of Honig and his team in the Form 8-K, and no such Schedule 13D filing was made, in an apparent effort to conceal those Defendants' large ownership stake in MGT Capital.

**MGT Capital's Undisclosed Stock Promotion in January – February 2016**

29.    On or around January 21, 2016, by which time Honig, Stetson, Groussman, Brauser, and O'Rourke had acquired at least 16.3% of MGT Capital's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as up-front payment for the promotion of MGT Capital.

30.    On February 3, 2016, an article was published online touting MGT Capital's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that its author had been paid by MGT Capital, at Honig's direction, to write the article. After the article was published, volume surged from 45,754 shares on February 2, 2016, to 3,250,272

shares on February 3, 2016 — a 7,000% increase. The intraday stock price on February 3, 2016 rose 60% from the previous close.

31.     Following the February 3, 2016 article, Defendants Ladd, Honig, Stetson, and O'Rourke sold over 430,000 shares for proceeds of around $198,800.

**MGT Capital's Pump-and-Dump Scheme Involving McAfee in May 2016**

32.     To further capitalize on their MGT Capital holdings, and in furtherance of the pump-and-dump scheme, Honig identified a potential acquisition target for MGT Capital. O'Rourke, under Honig's direction and with the knowledge and consent of Groussman, Brauser, and Stetson, arranged a deal between MGT Capital and McAfee.

33.     On March 29, 2016, O'Rourke sent McAfee a term sheet for the asset purchase of McAfee's company, D-Vasive Inc. ("D-Vasive"), by an "NYSE listed company." D-Vasive provided anti-spy software. On April 3, 2016, D-Vasive indicated it was interested in a deal. That same day, O'Rourke asked Honig if he still wanted to pursue the deal, to which Honig replied, "Yea!"

34.     On April 4, 2016, O'Rourke introduced Ladd to McAfee to begin negotiating a transaction between MGT Capital and McAfee's various business interests. O'Rourke and Honig helped orchestrate the deal, as evidenced by subsequent correspondence between Ladd and O'Rourke, and O'Rourke and Honig.

35.     On May 9, 2016, pre-market, Honig traded in MGT Capital's stock to create the misleading appearance of market liquidity. Honig bought and sold small quantities of stock dozens of times, while Brauser and Groussman (and his entity) also engaged in coordinated trades with Honig in MGT Capital stock during pre-market trading.

36.     Then, at 8:30 a.m. that same day, MGT Capital announced in a press release that it had entered into an asset purchase agreement to purchase certain assets from D-Vasive, and further providing that McAfee would be the proposed Executive Chairman and CEO. In return, MGT Capital would provide D-Vasive with: (i) $300,000 in cash at the date of closing; (ii) 4,760,000 unregistered shares of common stock to be held in escrow pending satisfaction of the representations and warranties of the purchase agreement; and (iii) 19,040,000 unregistered shares of common stock at the date of closing.

37.     The press release further suggested McAfee would achieve success at MGT Capital because he "sold his anti-virus company to Intel for $7.6 billion." This was false, as McAfee's namesake company was not sold to Intel for that amount until long after McAfee's departure from the company.

38.     That same day, StockBeast.com, a well-known internet promotion website, published an article by an unnamed author, entitled, "MGT Capital Beastmode engaged – John McAfee driving the Bus[.]" The article touted MGT

Capital and highlighted McAfee's involvement, repeating the materially false claim that McAfee had "sold his startup company to Intel for $7.6BB[.]" The article proclaimed, "This is big big big!"

39.    On May 9, 2016, MGT Capital's stock opened at $0.64, or $0.275 higher or 75% higher than its previous day closing price of $0.3647 on May 6, 2016. More than 10 million shares traded, as compared to 71,005 on the prior trading day. Nearly one week later, on May 17, 2016, the trading volume for MGT Capital reached 109,384,614 shares and the stock closed at $4.15 per share.

40.    Then, on May 26, 2016, MGT Capital announced its plan to acquire a second company in the cybersecurity sector, Demonsaw LLC ("Demonsaw"), a secure and anonymous file sharing software platform. Under the terms of the asset purchase agreement, Demonsaw shareholders would receive 20 million restricted shares of MGT Capital common stock, which required MGT Capital to issue new shares.[2]

41.    Between May 9, 2016 and May 31, 2016 following the announcements of these deals, the Scheme Defendants (Ladd, Honig, Brauser, Stetson, Groussman, and O'Rourke) sold over 9.3 million MGT Capital shares for total proceeds of over

---

[2] On July 8, 2016, MGT Capital issued a press release announcing the filing of a preliminary proxy statement, by which the two proposed acquisitions were simplified and "effectively combined into one" by "D-Vasive purchasing Demonsaw, with MGT buying the combined company pending stockholder approval."

$9.4 million. Ladd alone received over $516,544.08 in proceeds from the sale of 471,000 shares during this time.

42.     Honig freely accepted credit for his role in the transaction. On May 12, 2016, Honig received an email from an investment firm congratulating him on the recent transaction, to which Honig responded that he was the "[l]argest shareholder, fund and relationship with [McAfee]."

43.     In early August 2016, Honig also admitted his undisclosed role at MGT Capital in a chat with Stetson, stating, "its great in [MGT Capital] because we are behind the scenes."

44.     Honig, Stetson, Brauser, O'Rourke, and Groussman exercised control over MGT Capital's management, including Ladd. This is evidenced by certain events: (i) on October 1, 2015, when Ladd asked for and received Honig's direction regarding how to disclose Honig's group's stock acquisitions; (ii) on or around January 21, 2016, when Honig directed Ladd to wire $125,000 to a well-known stock promoter as an up-front payment to promote MGT Capital; and (iii) from March through May 2016, when O'Rourke, at Honig's direction, orchestrated the deal between McAfee and MGT Capital. Ladd did what he was told and sought approval regarding MGT Capital's SEC filings and business practices.

## **Defendants' False and Misleading Class Period Statements**

45.    Throughout the Class Period, MGT Capital's stock was manipulated in furtherance of the pump-and-dump scheme and by Defendants Honig, Stetson, Groussman, Brauser, and O'Rourke's control of Defendant Ladd.

46.    On October 9, 2015, MGT Capital filed a Form 8-K with the SEC disclosing that on October 8, 2015, it had entered into separate subscription agreements with accredited investors for the sale of $700,000 of units of MGT Capital. The Form 8-K did not disclose the names of the group of investors (Honig, Stetson, Groussman, Brauser and O'Rourke). The 8-K stated, in relevant part:

> On October 8, 2015, MGT Capital Investments, Inc. (the "Company") entered into separate subscription agreements (the "Subscription Agreement") with accredited investors (the "Investors") relating to the issuance and sale of $700,000 of units (the "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year warrant (the "Warrants") to purchase two shares of Common Stock at an initial exercise price of $0.25 per share (such sale and issuance, the "Private Placement").

47.    After the October 2015 financing had closed, Honig, Stetson, Groussman, Brauser, and O'Rourke failed to satisfy their obligation to file a Schedule 13D. They owned at least 16% of the Company's shares, in addition to warrants which, if converted, would have resulted in Honig, Groussman, Brauser, Stetson, and O'Rourke controlling at least 42% of the total common shares outstanding at the time.

48.     On April 14, 2016, MGT Capital filed a Form 10-K for the year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's full year 2015 financial results and position. The 2015 10-K was signed by Defendant Ladd. The 2015 10-K contained a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Ladd, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

49.     MGT Capital's 2015 10-K stated the Company's stock price was subject to volatility but failed to disclose it was being manipulated:

> ***Our stock price and trading volume may be volatile, which could result in losses for our stockholders.***
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common stock.  We cannot predict the potential impact of these periods of volatility on the price of our Common stock. The Company cannot assure you that the market price of our Common stock will not fluctuate or decline significantly in the future.

50.     On May 9, 2016, MGT Capital issued a press release announcing its intended acquisition of D-Vasive, McAfee's sale of his anti-virus company to Intel for $7.6 billion, and his proposed appointments as Executive Chairman and CEO of MGT Capital, stating in part:

### John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology

*Mr. McAfee to be Chairman and CEO of renamed John McAfee Global Technologies*

**HARRISON, NY (May 9, 2016)** MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from D-Vasive Inc., a provider of leading edge anti-spy software. D-Vasive offers a powerful tool for protection from the proliferation of invasive apps by consumer products companies, social networks, financial institutions and others. These invasive apps can secretly turn on a phone's microphone and camera, as well as monitor geographic movements and access contacts. The D-Vasive technology operates in a unique way, allowing the user to manage and control the device's internal hardware. D-Vasive will be available shortly for Android and Windows platforms, followed by a release for Apple iOS.

*In conjunction with the acquisition, MGT is pleased to announce the proposed appointment of John McAfee as Executive Chairman and Chief Executive Officer. Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion, and is actively involved in the development of new measures to protect individual freedoms and privacy.* Mr. McAfee stated, "The enormous impact of cybersecurity on our lives requires the scale and resources of a public company. Our ability to continue to hire the best minds in the business will be vastly enhanced with a public platform. With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into a successful and major force in the space." MGT Capital also intends to change its corporate name to John McAfee Global Technologies, Inc.

Additionally, MGT has entered into a consulting agreement with Future Tense Secure Systems Inc., a technology incubator with investments in other applications requiring privacy, such as file sharing and chat. It is contemplated by the parties that future collaborations or investments may occur going forward.

Closing of the acquisition is contingent on customary conditions including approval by MGT's stockholders. Major terms of the deal include the payment to D-Vasive Inc. stockholders of 23.8 million restricted shares of MGT stock and $300,000 in cash. The proposed share issuance is expected to amount to roughly 47% of the Company on a pro-forma fully diluted basis at closing. More detailed information can be found in the Company's Form 8-K filed this morning with the Securities and Exchange Commission, available at www.sec.gov, or the MGT website at www.mgtci.com.

(Emphasis added.)

51.    This press release was materially false, as McAfee's namesake company was not sold to Intel for that amount until long after his departure from the company.

52.    On April 20, 2017, MGT Capital filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's full year 2016 financial results and position. The 2016 10-K was signed by Defendants Ladd and McAfee. The 2016 10-K contained a signed SOX certification by Defendant Ladd, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

53.    MGT Capital's 2016 10-K stated the Company's stock price was subject to volatility but failed to disclose it was being manipulated:

> **Our stock price and trading volume may be volatile, which could result in losses for our stockholders.**

The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock. We cannot predict the potential impact of these periods of volatility on the price of our common stock. The Company cannot assure you that the market price of our common stock will not fluctuate or decline significantly in the future.

54.     On April 2, 2018, MGT Capital filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's full year 2017 financial results and position. The 2017 10-K was signed by Defendants Ladd and Lowrey. The 2017 10-K contained signed SOX certifications by Defendants Ladd and Lowrey, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

55.     MGT Capital's 2017 10-K stated the Company's stock price was subject to volatility but failed to disclose it was being manipulated:

***Our stock price and trading volume may be volatile, which could result in losses for our stockholders.***

The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common Stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common Stock. We cannot predict the potential impact of these periods of volatility on the price of our Common Stock. The

Company cannot assure you that the market price of our Common Stock will not fluctuate or decline significantly in the future.

56.     The statements referenced in ¶¶45-55 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants were engaged in a pump-and-dump scheme to artificially inflate MGT Capital's stock price; (2) this illicit scheme caused MGT Capital to make false and misleading statements, which would result in governmental scrutiny, including from the SEC; (3) certain Scheme Defendants exercised control over MGT Capital and its management; (4) consequently, the illicit scheme would ultimately cause MGT Capital's stock to become delisted from NYSE MKT; and (5) as a result, Defendants' statements about MGT Capital's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Slowly Emerges**

57.     On September 19, 2016, pre-market, MGT Capital issued a press release announcing that on September 15, 2016, MGT Capital had received a subpoena from the SEC requesting "certain information from the Company."[3]

---

[3] MGT Capital later acknowledged in a press release dated September 7, 2018 that this subpoena was related to the SEC's investigation into Ladd's involvement in the pump-and-dump scheme.

58.    On this news, shares of MGT Capital fell $0.74 or 22.7% to close at $2.52 per share on September 19, 2016.

59.    On September 20, 2016, pre-market, MGT announced that the NYSE had informed the Company the previous day that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vasive [sic] merger."

60.    On this news, MGT Capital's stock continued to fall $0.63 or 25% to close at $1.89 per share on September 20, 2016.

61.    On October 19, 2016, shortly before market-close, the NYSE MKT issued a press release stating "the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of MGT Capital Investments, Inc. . . . from the Exchange. Trading in the Company's common stock on the NYSE MKT will be suspended immediately." The press release further stated that "NYSE Regulation has determined that the Company is no longer suitable for listing" and had "commenced delisting proceedings pursuant to Section 1002(c) of the NYSE MKT Company Guide that applies when a company has sold or otherwise disposed of its principal operating assets, or has ceased to be an operating company."

62.    On October 20, 2016, MGT Capital issued a press release stating it was considering appealing the delisting and that MGT's common stock would begin trading OTC.

63.    On October 21, 2016, the next trading day following this news, MGT Capital's stock fell $1.07 or over 45% to close at $1.29 per share.

64.    On September 7, 2018, the SEC issued a press release entitled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes." The SEC made its complaint against Ladd, and others, available on its website at https://www.sec.gov/news/press-release/2018-182. Investors were not on notice of Defendants' scienter until the SEC complaint's disclosures were made available. The press release stated, in relevant part:

> The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> ***According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes.*** Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes. ***Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.***
>
> "As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement. "They failed to appreciate, however, the

SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."

***The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman***, Frost, Elliot Maza, ***Robert Ladd***, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc., Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

(Emphasis added.)

65.     On this news, shares of MGT Capital fell $0.195 or over 33% during the next two trading days to close at $0.395 per share on September 10, 2018, damaging investors.

66.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of MGT Capital during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE and OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

23

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

73.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NYSE and OTC, and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

74.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

80.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such

statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

81.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

82.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity

of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

83.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

84.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

85.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 9(a) and (f) of the Exchange Act
Against the Scheme Defendants**

86.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.   During the Class Period, the Scheme Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of MGT Capital's securities; and (3) mislead and caused Plaintiff and other members of the Class to purchase MGT Capital's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

88.   The Scheme Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of MGT Capital's securities in an effort to maintain artificially high market prices for MGT Capital's securities in violation of Sections 9(a) and 9(f) of the Exchange Act. The Scheme Defendants are sued either as primary participants

29

in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

89.   By virtue of the foregoing, the Scheme Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of MGT Capital securities which Defendants knew or had reasonable ground to believe were so false or misleading.

90.   The Scheme Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of MGT Capital securities which Defendants knew or had reasonable grounds to believe were so false or misleading.

91.   Each of the Scheme Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Scheme Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Scheme Defendants, by virtue of his responsibilities and activities as a senior officer, and/or director of the Company, and/or agent of the Company was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Scheme Defendants enjoyed

significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Scheme Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

92.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding MGT Capital's true value and the Scheme Defendants' price manipulation, which was not disclosed by the Scheme Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired MGT Capital securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

93.    By virtue of the foregoing, the Scheme Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) and 78i(f).

94.    As a direct and proximate result of Count II Defendants' conduct as described herein, Plaintiff has suffered significant damages and is entitled to such damages from the Scheme Defendants, jointly and severally.

95.     This action was filed within one year of discovery of the fraud and within three years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT III

**Violation of Section 20(a) of the Exchange Act
Against the Officer Defendants**

96.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     During the Class Period, the Officer Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

98.     As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

99.     Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the

marketplace during the Class Period. Throughout the Class Period, the Officer Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

100.   Each of the Officer Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Officer Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Officer Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

101.   By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## <u>COUNT IV</u>

**Violation of Section 20(b) of the Exchange Act Against Honig, Brauser, O'Rourke, Stetson, and Groussman**

102.   Plaintiff repeats and realleges each and every allegation contained in

the foregoing paragraphs as if fully set forth herein.

103.   By their conduct as alleged above, Count IV Defendants directly and indirectly, acted through and used another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

104.   In acting through and using another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Count IV Defendants acted intentionally, knowingly or with severe recklessness with respect to the truth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: September 28, 2018      Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: <u>/s/Laurence M. Rosen</u>
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*